IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

HERMAN A. FISCHER, III, )
        Plaintiff )
        v. )   No. 3:05-cv-308
PRINCIPAL LIFE INSURANCE )
COMPANY, )
        Defendant )
  )

## **MEMORANDUM OPINION**

This is an action under the ERISA statute, 29 U.S.C. § 1132(a)(1)(B), removed to this court from the Chancery Court of Knox County. Plaintiff Herman A. Fischer, III, contests defendant Principal Life Insurance Company's (Principal) denial of his claim for long-term disability benefits under a policy issued to his former employer, Lutheran Services in Tennessee, Inc. Currently pending are cross-motions for judgment on the administrative record under the guidelines set out in *Wilkins v. Baptist Healthcare Systems, Inc.*, 150 F.3d 609 (6th Cir. 1998). [Court Files #16, #18]. For the reasons that follow, plaintiff's motion will be granted, defendant's motion will be denied, and the decision to deny benefits reversed.

# I.

## *Factual Background*

(a) <u>Plaintiff's Employment History</u>

The following employment history of the plaintiff with Lutheran Services in Tennessee, Inc., is taken from the administrative record and is virtually undisputed.

Lutheran Services is a non-profit, charitable organization affiliated with the Evangelical Lutheran Church in America. Plaintiff was hired in 1981 as its President and CEO, a position which he held until June 2003. As President and CEO, he supervised himself, but was responsible to, and reported to, the Board of Directors of the corporation. Further, as President and CEO, plaintiff basically defined himself how his job duties would be carried out to meet the approval of the Board of Directors. The only evidence in the record containing a description of how plaintiff carried out his function as President and CEO is set out in Mr. Fischer's own affidavit as follows:

> Throughout my tenure as President and CEO of Lutheran Services, the majority of my duties to the corporation involved hands-on-review and supervision of the company's charitable programs where they are conducted out in the field (13 programs at 13 locations in eight Tennessee counties), and personal fund-raising and other

2

> face-to-face relational activities with potential donors and church congregations throughout the corporation's coverage region. Fulfilling these duties required frequent personal travel by car and substantial time in face-to-face meetings with corporation staff, our Board, other charitable organizations, charitable caregivers, and potential donors or donor groups. Lutheran churches in Tennessee, Mississippi, Alabama and Georgia supported the agency, and during my tenure as CEO, I made presentations in all 225 congregations in those states every two-three years. Many if not most of my fund raising and relational efforts required public speaking before large groups, such as church congregations, at which I would have to be standing up during my presentation. With voluntary donations being the lifeblood of any charitable organization, the pressure to maintain personal contact and relationships with donors and donor groups, like church congregations, was constant, and even became more acute when charitable giving dramatically declined after the September 11, 2001 disasters. I have carefully gone through my date books for the calendar years 1998 through 2003, and have made notes of every instance of travel and outside-the-office work activity I carried out during those years, and those daily notes, in my handwriting, are attached hereto.

Administrative Record at 314-315. It is undisputed that the amount of work-related travel, public speaking and face-to-face communication which plaintiff carried out in his job as President and CEO was extensive.

In 1999, plaintiff, in a report to his Board of Directors, drafted a job description for the Chief Executive Officer. Although the job description is couched in general terms and does not describe the actual physical requirements of the job,

3

it does provide considerable insight into how plaintiff and the Board of Directors perceived it. The job description provided the following definition of the job function:

> Provides a professional program of human services designed to strengthen the well-being and development of families and individuals, responsive to the needs of the entire community and delivered with compassion, by planning, organizing, directing, and controlling the resources of the corporation, while maintaining high morale among staff members.

Administrative Record at 271. The job description goes on to describe the CEO's "essential functions" as follows:

> 1. Identifies community service requirements, both actual and anticipated, by active personal contact and rapport with potential and actual clients and other persons in a position to understand the needs of the community.
>
> 2. Addresses changing community and professional trends by inaugurating progressive programs.
>
> 3. Develops a competent, productive, and satisfied staff by supervising, directly and through delegation, all personnel, including hiring, transferring, promoting, demoting, disciplining, counseling, coaching, appraisal performance, and terminating, as well as by providing educational and experiential growth opportunities.
>
> 4. Plans for and protects the physical and financial resources of the corporation by budgeting, controlling, and auditing, and by initiating and participating in fund-raising activities, including the submission of grants.

4

> 5. Ensures the smooth operation of the agency by formulating and enforcing program, operational, and personnel policies and procedures.
>
> 6. Maintains the stability and reputation of the agency by complying with, or influencing, the development of legal and accreditation requirements.
>
> 7. Promotes a positive image of the agency by ensuring an understanding of program services available, publicizing accomplishments and conducting one's self according to a professional code of ethics.
>
> 8. Provides agency consultative services to congregations and participate in coordinating programs which may be sponsored by church or community.
>
> 9. Contributes to the effectiveness of the Board of Directors by identifying short-term and long-term issues which must be addressed, providing information and commentary pertinent to its deliberations, recommending options and courses of action, especially where professional considerations are involved, implementing directives, and recruiting candidates.
>
> 10. Sets a personal example of the highest level of leadership and motivation for all employees.
>
> 11. Serves in other capacities at the discretion of the Board of Directors.

Administrative Record at 271-272.

Over the years, plaintiff has had numerous surgeries on his right knee, and in late 2000, upon continuing pain, opted to have a total replacement of his right knee. Prior to the operation, he warned the Board of Directors that the surgery could

limit some of his ability to perform the physical functions of his job and obtained the Board's permission to perform some work out of his home following the operation. Although the knee replacement was mechanically successful, plaintiff continued to have significant pain in the right knee and down into the right foot, as well as low back pain. He also began to suffer from depression and alcoholism, which he claims resulted from his inability to perform the physical requirements of his work and stress related thereto. An MRI revealed objective findings in plaintiff's lumbar spine to support his allegations of back pain, which plaintiff elected to treat with physical therapy rather than surgery.

Between late 2000 and plaintiff's resignation from his employment in June 2003, the way in which plaintiff performed his job and the adequacy with which the Board of Directors judged his performance changed considerably. The best description of how plaintiff performed his job following the onset of his medical problems is described by the Chairman of the Board in a response to the defendant asking what he was doing "before leaving Lutheran Services in Tennessee, Inc., in June 2003." The Chairman of the Board reported:

> 1. Approximately 90% executive desk duties, such as phone calls and conferences, written correspondence, e-mail, reports, etc., were performed from the office in CEO's home.

2. Approximately 10% executive desk duties, as written above, were performed from the corporate office in Knoxville, Tennessee.

3. CEO delegated and reviewed grant applications, program development, budgeting and fund-raising.

4. Contact with Lutheran congregations, ministers and other ministry partners was maintained through phone calls, written correspondence, and e-mail. Speaking engagements at local congregations were delegated to VPs.

5. CEO performance hiring, firing, employee performance reviews from corporate office. (Employee reviews - annually; hiring and firing as needed for small business).

6. Attend monthly staff meetings.

7. Maintain communication with local staff from home office via phone, e-mail and fax.

8. Attend quarterly Board meetings, occasionally held out of town (in state).

9. Attended two out of state conferences in two years.

10. Occasional face-to-face visits with local clergy and ministry partners, in LST office or another party's office.

Administrative Record at 374.

Plaintiff's performance in the manner described above was completely inadequate to satisfy the Board of Directors. In his evaluation dated December 5,

7

2002, the Board noted that in many categories the plaintiff's performance was "floundering." Under General Comments, the Board noted the following:

> 1. Too many responsibilities have not been met Satisfactorily.
>
> 2. Not adequately supervised financial matters.
>
> 3. Not adequately responded to Board requests for detailed financials.
>
> 4. Not adequately communicated with Board, reports late.
>
> 5. Butch's role is changing and there are factors beyond his control, which contribute to floundering. He needs to be retrained for emerging role.

Administrative Record at 331. Finally, the evaluation noted the following under the category of Leadership: "Butch seems to be unable to provide the needed leadership. Sick with various ailments. I believe these ailments are directly related to the agency and his spiritual life." Administrative Record at 331.

Following this negative evaluation, the Board of Directors gave the plaintiff six months to improve his performance. The plaintiff was unable to do so. He described those attempts in his affidavits as follows:

> My constant back pain and nerves persisted into the year 2003, and continued to adversely affect my ability to meet the duties rightfully expected of me by my Board and our

8

> company's donors and charitable constituents. By May of 2003, my pain and anxiety had reached the point where my travel, meeting and presentation responsibilities were not being met, and I was basically receiving a salary for doing administrative paper work out of my home. I did not feel, and I do not believe, the Board felt that my impaired performance situation should or could continue. When my physician, Dr. Hurst, informally advised me to quit for my own good in May, 2003, I finally decided to submit my resignation, which I did the next month. The Board graciously accepted my resignation, but without resistence or reluctance on their part, which I fully understood. This was not occasioned by a sudden loss of one or more of my specific abilities, but had been building up with an increasing inability to focus on my job, and to meet its intensely interpersonal duties with staff, caregivers, and donors, which had been progressing over a long and sustained period of time. As a result of my back and leg pain, and now pain coming out of my neck, and my anxiety, depression and susceptibility to panic attacks, which are all being treated with prescription medications, many of which have side effects that would prevent me from working, I am simply unable to meet the duties and expectations imposed upon a functioning and successful President and Chief Executive Officer of a religious, charitable organization. ...

Administrative Record at 317. Plaintiff's last day of work was June 30, 2003.

(b) <u>The Medical Evidence</u>

Plaintiff's main treating physician during this period of time was a family physician named Dr. Fred Hurst. Dr. Hurst provided a clinical note dated September 8, 2003, giving the following summarized assessment of the plaintiff's physical and mental condition:

9

1. Complete physical, preventive.

2. Probable right renal stones. Check CT renal.

3. COPD on Advair and Combivent and Dilor-G.

4. Essential hypertension on Adalat.

5. Generalized anxiety on Xanax.

6. GERD stable on Nexium.

7. Degenerative disc disease L4/5, L5/S1, lumbar.

8. Osteoarthritis spine and weight bearing joints.

9. Sinobronchitis.

Relative to plaintiff's medical condition at the time he left his job on July 1, 2003, Dr. Hurst recorded plaintiff's assessments as including "chronic pain syndrome" and "generalized anxiety and depression on Xanax and Paxil." Administrative Record at 573. On July 15, 2003, Dr. Hurst completed a disability claim form in which he asserted that the plaintiff would be unable to "seek gainful work ever." However, the plaintiff himself admitted in his affidavit that he was not disabled from *any* work, as claimed by Dr. Hurst, and that his impairments did not prevent him from going through the motions of a desk job from his house, which his employer had allowed him to do. Rather, he claimed that his impairments would preclude him only from doing the "normal" work of a President and CEO of a religious charity.

Plaintiff was treated for his back pain at the Knoxville Orthopedic Clinic. On August 22, 2003, he was diagnosed as suffering from degenerative disc disease at L4-5 and 5-1 and spinal stenosis. An MRI of his lumbar spine was ordered which was performed on September 16, 2003. Dr. Paul Johnson described the findings on the MRI as follows:

> Reversal of the normal lumbar lordosis with multilevel degenerative changes as detailed above. Numerous abnormalities as above. At L3-4 there is mild central canal stenosis, and also right lateral disc bulge appears to posteriorly displace the right L3 root far laterally with the foramen. Mild to moderate central canal stenosis at 4-5 with moderately severe left foraminal stenosis and mild right foraminal stenosis. Severe right foraminal stenosis at 5-1, likely combination of spur and soft disc, also with mild left foraminal stenosis at 5-1. Details above.

Administrative Record at 582. Following these findings, plaintiff was faced with treatment options, including surgery, and plaintiff chose to pursue physical therapy. The physical therapy was ineffective, and at the time the administrative record was completed, plaintiff was again anticipating back surgery.

With respect to his mental conditions, plaintiff was examined by clinical psychologist H. Abraham Brietstein, Ph.D., on August 10, 2004, to determine his eligibility for vocational rehabilitation services. Dr. Brietstein observed the following with respect to his clinical observations of the plaintiff:

11

> ... Mr. Fischer walked slowly with a noticeable limp and used a cane to steady himself. He interacted in a polite, courteous fashion although was rather quiet, soft spoken and somewhat withdrawn. He spoke fluently and clearly though tends to be somewhat circuitous, having difficulty getting to the point. His affect was visibly depressed, and he described his mood as depressed. In addition, his thinking was slowed and his level of consciousness somewhat clouded. ...

Dr. Brietstein's summary of his evaluation and recommendations were as follows:

> Results of the neuropsychological evaluation revealed some cognitive changes including significant psychomotor slowing that may be greater on the left side than the right. This is accompanied by marked deficits on tasks that require perceptual reasoning, psychomotor speed and cognitive flexibility. He also is noted to have marked deficits on tasks that require a working memory, while his memory is otherwise in tact. Given the absence of any known neurological problems, these deficits are likely attributable to his severe depression and panic attacks, although one would want to rule out the presence of any organic cause of these deficits. He is currently severely depressed which greatly limits his ability to interact with other people and results in his spending excessive amounts of time at home. In addition, his work performance is likely to suffer dramatically because of his slowed thinking, making it all but impossible for him to perform adequately on tasks that carry a high level of responsibility, as he once held. Given the above, the following are some recommendations:
>
> 1. Mr. Fischer should be referred for a CT scan to rule out any structural changes in his brain that might account for the cognitive slowing.

12

> 2. He is not currently receiving adequate treatment for his severe depression and a referral for both psychiatric treatment and managed medication and psychological treatment for psychotherapy is recommended.
>
> 3. Mr. Fischer is highly educated, and it is unclear how any additional training or education would assist him in returning to work. His efforts would be better served by getting appropriate treatment for the severe depression and if he recovers well enough, he could be referred at that time for assistance with job placement within his field.

Administrative Record at 497. Dr. Brietstein's diagnostic impression was of a severe recurrent major depressive disorder and a panic disorder with agoraphobia. *Id.*

The record also contains "peer review" reports of Dr. Vincent Fiorica, a physician within defendant's medical department. Dr. Fiorica examined plaintiff's disability claim file and opined that there was "no objective medical information or documentation to support the contention that Mr. Fischer is unable to resume and continue the occupational activities in which he was engaged prior to leaving work on June 30, 2003." The court has reviewed Dr. Fiorica's report and finds that it is totally without foundation and of no help in resolving the question of whether plaintiff was disabled from his former job as President and CEO of a religious charity.

First, Dr. Fiorica is apparently an in-house insurance company physician who has never seen or examined the plaintiff. Second, Dr. Fiorica's statement that

13

there was no objective medical information or documentation to support plaintiff's claim is patently absurd. Ample objective medical information and documentation is provided by the extensive MRI analysis by Dr. Johnson, which is mentioned above. Third, it is obvious that Dr. Fiorica, in making his claim that plaintiff could resume his occupational activities in which he was engaged prior to leaving work on June 30, 2003, is referring to whether plaintiff could return to the inadequate, low-functioning job working primarily out of his house, which plaintiff performed after his medical and psychological problems began as opposed to the dynamic, high-performing job which plaintiff was expected to and apparently did perform prior to his health problems. Accordingly, the court cannot accord any significant weight to Dr. Fiorica's opinion.

In addition, the defendant submitted Mr. Fischer's medical documentation for an independent peer review to Dr. Russell Packard, a neurologist and psychiatrist, for review. Dr. Packard opined that plaintiff's medical documentation did not support his inability to work at his occupation as a CEO. Dr. Packard's report suffers from many of the same inadequacies as Dr. Fiorica's. First, he also has never seen or examined the plaintiff, although the defendant had the right under the disability policy to have the plaintiff examined by a physician of its choice. *See* Administrative Record at 84. Second, Dr. Packard's report supports the

14

plaintiff's position that plaintiff's negative job performance evaluation in late 2002 was likely due to his poor health when Dr. Packard notes:

> The Neuropsychiatric evaluation indicates severe major depression ... and anxiety attacks around people are probably related to the depression. ... If he was depressed and preoccupied with pain, this could definitely have affected his performance in a negative way.

Administrative Record at 425. Finally, as with Dr. Fiorica, Dr. Packard assumes in evaluating plaintiff's physical and psychiatric problems with regard to the performance of the job of CEO that he would be performing inadequately, as he did post-2000, rather than adequately, as he did pre-2000. Thus, Dr. Packard's opinion is also of little help in resolving the issue that is dispositive of this case.

## II.
### *ERISA Standards*

The United States Court of Appeals for the Sixth Circuit set out the standards for adjudicating ERISA benefit claims in *Wilkins v. Baptist Healthcare Systems, Inc.*, 150 F.3d 609 (6th Cir. 1998). A court reviewing a decision on ERISA benefits should consider only the record before the plan administrator at the time the decision was rendered. *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996). Where the terms of the Plan give the administrator discretionary

15

authority to determine eligibility for benefits, the decisionmaker will be given great deference, and will be overturned only where the decision is arbitrary and capricious. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

The language of the Basic Long Term Disability Plan provides as follows:

> Principal has complete discretion to construe or interpret the provisions of this group insurance policy, to determine eligibility for benefits, and to determine the type and extent of benefits, if any, to be provided.

Administrative Record at 61. The court finds that the plan language in this case gives the plan administrator the discretionary authority to determine eligibility for benefits and construe the terms of the Plan under the arbitrary and capricious standard. The "arbitrary and capricious" standard of review is "the least demanding form of judicial review, and requires only that the [administrator's] determinations ... be 'rational' in light of the Plan's provisions." *Perry v. United Food and Commercial Workers District Unions 405 and 442*, 64 F.3d 238, 242 (6th Cir. 1995). Where it is "possible to offer a reasoned explanation, based on the evidence, for a particular outcome, the outcome is not arbitrary and capricious." *Davis v. Kentucky Finance Company's Retirement Plan*, 887 F.2d 689, 693-94 (6th Cir. 1989).

III.

*Analysis*

In this case, plaintiff's claim for disability benefits was denied with the explanation that the job duties which plaintiff was performing "going back at least to March of 2002, entailed working primarily from his home performing executive desk duties such as phone calls and conferences, written correspondence, e-mails, reports, etc." Administrative Record at 283. Plaintiff does not dispute that he was capable of performing, however inadequately, his job from his home as he did after his knee replacement surgery in late 2000, nor does the defendant dispute that plaintiff's combination of impairments would have prevented him from performing the position of President and CEO as he performed it prior to late 2000 and as described in plaintiff's affidavit. *See* Administrative Record at 314-320. Thus, the question which resolves this case is whether defendant's determination that the plaintiff's "normal occupation" was the limited job which he inadequately performed following his operation in late 2000 was arbitrary and capricious. I find that it was.

Obviously, when the Lutheran Services Board of Directors hired the plaintiff, it did not expect a President and CEO who would spend 90% of his work time at home using the telephone and e-mails and 10% at the local office. That this type of job performance was inadequate is obvious from the unacceptable job

evaluation which the plaintiff received in late 2002. It is further obvious that the type of job performance which the Board of Directors expected was the high functioning job which the plaintiff performed prior to 2000 when he traveled repeatedly over the four-state area that the Lutheran Services covers and was often on his feet engaged in public speaking. The court finds that it is important in this case that plaintiff was the President and CEO of the corporation, answerable only to the Board of Directors, and that as such he in large part determined what the functions of the job were. The only place in which the physical requirements of the job is set out is in plaintiff's own affidavit, wherein he described traveling to over 200 churches in the four-state area every three years to solicit funds. The court finds that in this case the only reasonable interpretation of plaintiff's "normal occupation" is that described in plaintiff's affidavit.

The defendant has suggested that the unreported opinion of the Sixth Circuit, *Schmidlkofer v. Directory Distributing Associates, Inc.*, 107 Fed. Appx. 631 (6th Cir. 2004), supports its position that plaintiff's normal occupation was that which he was performing immediately prior to his resignation. The court disagrees and notes that *Schmidlkofer* actually supports plaintiff's position.

*Schmidlkofer* cites a number of cases recognizing that the term "regular occupation" means a general occupation rather than a particular position with a

18

particular employer. *Id.* at 633.  Assuming that to be the case, it is impossible to believe that any President and CEO of a small religious charity or other corporation engaged in fund raising could adequately perform in his job spending 90% of his work time at his home, 10% at his local office, and virtually no time on the road face-to-face with the individuals from whom he was soliciting funds for the corporation.

IV.

***Conclusion***

In light of the foregoing, the court finds that defendant's determination that plaintiff could perform his normal occupation was arbitrary and capricious. Accordingly, plaintiff is entitled to twelve (12) months of disability insurance benefits properly calculated under the defendant's insurance policy, plus pre-judgment interest, plaintiff's attorneys' fees, and other costs of this action.  Further, defendant is directed to perform an "any occupation" review of plaintiff's continuing claim for disability insurance benefits.  The parties should attempt to agree upon the amount of past-due benefits, pre-judgment interest, attorneys' fees and costs within thirty (30) days from the date of the entry of this order.  If unable to agree on this amount, the parties should advise the court in writing.

19

Plaintiff's motion for judgment on the administrative record [Court File #16] will be granted, and defendant's motion for judgment on the administrative record [Court File #18] will be denied.

Order accordingly.

                                        *s/ James H. Jarvis*
                                  UNITED STATES DISTRICT JUDGE